IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

|  |  |  |
|---|---|---|
| **REX RICHARD SAUNDERS,** | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CIVIL NO. 3:05CV731 |
| **EQUIFAX INFORMATION SERVICES, L.L.C.,** *et al.*, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

This matter is before the court on: (1) the Defendant Branch Banking & Trust Company of Virginia's (BB&T)[1] Motion for Summary Judgment (Docket Entry No. 28); and (2) the Plaintiff's Motion to Strike BB&T's Declarations & Exhibits in Support of its Motion for Summary Judgment, and Plaintiff's Memorandum in Support (Docket Entry No. 41). The court

---

[1] The Plaintiff has brought suit against BB&T as a "furnisher" of credit information. Although "furnisher" is not defined in the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA"), the term is understood as including any entity, such as BB&T, that provides information about its customers to credit reporting agencies (CRAs), including information about a customer's payments on their accounts. See Bd. Of Governors of the Fed. Reserve Sys., FTC, 109th Cong., Report to Congress on the Fair Credit Reporting Act Dispute Process, 4 (Aug. 2006), *available at* http://www.ftc.gov/os/comments/fcradispute/P044808fcradisputeprocess reporttocondress.pdf (last visited September 29, 2006). See also Carney v. Experian Info. Solutions, Inc., 57 F. Supp. 2d 496, 501 (W.D. Tenn. 1999) (defining "furnisher of information" as an entity which transmits information concerning a particular debt owed by a consumer to a consumer reporting agency). In any event, BB&T concedes that it is a "person who furnishes information" to a CSA as that term is used in 15 U.S.C. § 1681h(e). (BB&T's Mem. in Supp. Mot. Summ. J. (BB&T's Mem.) at 9.) Thus, the question of whether BB&T is a "furnisher" of credit information is not in dispute.

has reviewed all relevant submissions and has entertained oral argument. For the reasons discussed herein, the Defendant's Motion for Summary Judgment will be GRANTED in part and DENIED in part; and the Plaintiff's Motion to Strike will be DENIED as moot.

## STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). BB&T as the moving party bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The court must view the record and inferences in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). However, the non-moving party may not rest upon mere allegations or conclusory denials to overcome the entry of summary judgment. Anderson, 477 U.S. at 248. If the moving party presents affidavits in support of its motion for summary judgment, the non-moving party's response must be supported by affidavit or, as otherwise provided by Rule 56, specific facts must be presented to establish that there are at least issues of disputed material fact that preclude the awarding of dispositive relief. Fed. R. Civ. P. 56(e). Therefore, summary judgment is only proper if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, [and] there [is] no genuine issue for trial." Matsushita, 475 U.S. at 587.

## UNDISPUTED MATERIAL FACTS

The court deems the following to be the relevant undisputed facts and the reasonable inferences (Findings) to be drawn therefrom upon which the pending motions are to be resolved:

1. The Plaintiff purchased a used 2003 Mitsubishi Montero Sport vehicle (First Montero) on August 31, 2003, from an automobile dealer (Richmond Mitsubishi) in Richmond, Virginia. (BB&T's Mem. at 2; Pl.'s Mem. in Opp'n to BB&T's Mot. for Summ. J. (Pl.'s Mem.) at 4.)

2. The First Montero was financed on the basis of a retail installment sale contract (First RISC) assigned by Richmond Mitsubishi to BB&T upon BB&T's agreement to finance the loan it extended to the Plaintiff to purchase the vehicle. (BB&T's Mem. at 2; Pl.'s Mem. at 2.) The First RISC called for forty-eight monthly payments beginning October 15, 2003, in the amount of $435.03 per month. (BB&T's Mem. at 2.)

3. BB&T established an account for the First RISC (the 001 Account) in a timely fashion and forwarded a payment book to the Plaintiff to be used in making the required monthly payments on the loan. (BB&T's Mem. at 2; Pl.'s Mem. at 4.) The Plaintiff successfully made his October and November payments.

4. The First Montero developed mechanical problems that caused the Plaintiff to trade it back to Richmond Mitsubishi on November 22, 2003, as part of the purchase of a second 2003 Mitsubishi Montero Sport (Second Montero). (BB&T's Mem. at 2; Pl.'s Mem. at 9.) The first RISC was paid off by the dealer as a condition of the Second Montero purchase. (Id.)

5. The Second Montero was financed with a second retail installment sale contract (Second RISC) and monthly payments were scheduled to begin on January 6, 2004. (BB&T's Mem. at 3; Pl.'s Mem. at 9.)

6. The Plaintiff assumed that the Second RISC was also assigned to BB&T, although he was not expressly told so by the dealer at time of purchase. (BB&T's Mem., Ex. 18 (Saunders Dep.) at 31:1-5.) Plaintiff's copy of the Second RISC does not identify BB&T as the assignee.

7. The Plaintiff was not sent or given a payment instructions/coupon book for the financing of the Second RISC prior to March 2004. (BB&T's Reply in Supp. Mot. Summ. J. and Opp'n to Pl.'s Mot. to Strike (BB&T Reply) at 4.)

8. The Plaintiff inquired in the December 2003 time frame at a BB&T bank branch office about the Second RISC, but was told by a representative of the bank that he did not have a loan with BB&T at that time. (Pl.'s Mem. at 10-11.)

9. BB&T acquired another bank (First Virginia Bank) in the same general time frame and issues

    developed in the transition during the merger that may have contributed to the Second RISC loan not being promptly recorded or otherwise noted ("booked") by BB&T in a timely matter. (Pl.'s Mem. Ex. I (Holben Dep.) at 28:20-31.)

10. The Plaintiff contacted Richmond Mitsubishi inquiring to whom and how to pay on the Second RISC, but the dealer representative who responded indicated that since the loan had been assigned to a lender, the dealership was no longer involved in the matter. (Pl.'s Mem. at 11.)

11. The Plaintiff received a copy of the title for the Second Montero from the Virginia DMV on January 27, 2004, that indicated no liens had been placed on the vehicle. (Pl.'s Mem. at 5.)

12. The Second RISC loan was not "booked" in January or February 2004 and, therefore, the Plaintiff did not receive a coupon book or make any payment on the Second RISC loan during either month. (BB&T's Mem. at 3-4; Pl.'s Mem. at 10.)

13. The Second RISC loan was finally booked at BB&T on Thursday, March 4, 2004 (the 002 Account). (BB&T's Mem. at 3-4.)

14. The Plaintiff did not make the March payment (due on Saturday, March 6, 2004), nor did he attempt to tender any payment. (BB&T's Mem. at 3.)

15. The Plaintiff had not received a coupon book or instructions regarding payment of the loan prior to March 6, 2004. (BB&T's Mem. at 4; Pl.'s Mem. at 13.)

16. A demand letter, dated March 8, 2004, was forwarded to the Plaintiff by BB&T stating that the 002 Account was seriously delinquent, that the Second RISC was in default, and that the Second RISC had been accelerated with payment being demanded in full, including additional late fees and related penalties. (BB&T's Mem. at 4.) Plaintiff does not deny receiving this letter.

17. The Plaintiff and BB&T discussed a possible resolution of the matter by deferred payment, but the bank refused to waive the late fees and penalties as the Plaintiff had demanded. (Pl.'s Mem. at 13.)

18. The Plaintiff did not make the April 2004 payment. (BB&T's Mem. at 4; Pl.'s Mem. at 13-14.)

19. BB&T thereupon caused the Second Montero to be repossessed on April 14, 2004. (BB&T's Mem. at 4.) On April 16, 2004, BB&T notified the Plaintiff that the total amount due was $20,971.25, and that the Second Montero would be sold by private sale beginning April 26, 2004, or thereafter until sold. (BB&T's Mem. at 5.)

20. BB&T sent notices to the CRAs in April 2004 that the 001 Account had been paid, and

BB&T asserts that it did not provide any derogatory information about the account as claimed by the Plaintiff. (Id. at 4.)

21. The Plaintiff did not make the May 2004 payment (due on May 6). (Id. at 5.)

22. The Second Montero was sold on May 27, 2004 at a Fredericksburg, Virginia Auto Auction for $15,900 which equaled the wholesale value of the vehicle as prescribed by the used car industry "Blackbook" of values. (Id. at 5.)

23. The auction was not open to the public, but it was attended by over 1,000 bidders and information concerning the proposed auction of the Second Montero, with necessary specifics concerning the vehicle, was circulated via the internet and by hard copy to potential bidders in advance of the auction. (Id. at 6.)

24. In June of 2004, the CRAs sent BB&T a request (Automated Consumer Debt Verification or ACDV) seeking to have BB&T verify or correct the 001 Account as it had been reported to the CRAs. The ACDV showed that the 001 Account had not been paid in a timely manner. (Id. at 6.) BB&T responded by stating that such information was incorrect and that timely payment on the loan had been paid. (BB&T's Mem. at 6.)

25. The Plaintiff filed a dispute in June 2004 in which he asserted that the information being reported concerning the 002 Account was inaccurate. (Pl.'s Mem. at 15-16; BB&T's Mem. at 5, ¶ 22.)

26. The CRAs sent BB&T another ACDV concerning the 002 Account, and BB&T reported that the Account had been delinquent, that the Second Montero had been repossessed, and that the 002 Account had been ultimately "written off" (a negative credit term). (BB&T's Mem. at 7.)

27. BB&T's standard procedure for processing a car loan was to enter the loan that had been assigned to it by a dealer into its system within a reasonable period of approximately ten days ("book it") and establish an account; forward a coupon payment book and any instructions to the consumer; notify the consumer of any payment past due by ten days, placing the loan in a default status and demanding full payment of the loan (including any late fees and penalties); report to the CRAs that the loan was past due and in default after thirty days without payment; and repossess the collateral (the vehicle) if payment was still not forthcoming. (Holben Dep. at 29:1-24, 31:10-25, 35; 21-25, 36:1-10, 79-80; BB&T's Mem., Ex. 4 at 3.)

28. The Plaintiff's credit rating was negatively affected as a result of the information BB&T reported to the CRAs concerning at least the 002 Account.

**ANALYSIS**

Plaintiff has filed suit against four defendants, and all claims except those made against BB&T have been resolved.  The Plaintiff alleges (1) that BB&T, through its published reports to the CRAs, defamed the Plaintiff; (2) that BB&T violated 15 U.S.C. § 1681s-2(b) of the FCRA by failing to properly investigate the Plaintiff's disputes regarding monies owed under the 002 Account; and (3) that BB&T unlawfully repossessed the Second Montero and then disposed of the vehicle in a commercially unreasonable manner in violation of Article 9 of the Uniform Commercial Code (U.C.C.), as adopted by statute in Va. Code Ann. § 8.9A-101 et seq.  (Compl. ¶¶ 22-35.)  Each claim will be addressed in turn.[2]

**I. Defamation**

The Plaintiff alleges that BB&T willfully and with legal malice committed defamation by furnishing inaccurate information concerning the 001 and 002 Accounts to the CRAs, which were then published.  (Compl. ¶ 23.)  Specifically, the Plaintiff claims that BB&T reported to the CRAs that the 001 Account had been paid late, and that the 002 Account was unpaid, the collateral had been repossessed, and the indebtedness had been "charged [or] written off."  (Pl.'s Mem. at 37-41).  The Plaintiff asserts that the inaccurate information was reported to the CRAs

---

[2] The parties have consented to the undersigned's jurisdiction pursuant to 28 U.S.C. § 636(c)(1).  Federal question jurisdiction is conferred on this court by virtue of the plaintiff's federal FCRA claims.  See 28 U.S.C. § 1331 (conferring original subject matter jurisdiction on federal courts for claims "arising under" the laws of the United States).  The court likewise has supplemental jurisdiction over the Plaintiff's pendent state law U.C.C. claim pursuant to 28 U.S.C. § 1367(a) (court may exercise supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III....").

knowingly, intentionally, and in conscious disregard of the Plaintiff's rights. (Id.)

Pursuant to the FCRA, no consumer may bring an action for defamation against a person who furnishes false and/or inaccurate information to a CRA unless "the false information [was] furnished with malice or willful intent to injure such consumer." 15 U.S.C. § 1681h(e); Jeffrey v. Trans Union, L.L.C., 273 F. Supp. 2d 725, 728 (E.D. Va. 2003). In other words, unless a plaintiff can raise a material issue of fact as to whether a defendant "acted with malice or willful intent to injure" him, § 1681h(e) precludes a defamation claim. Although the FCRA does not define "malice" or "willful intent to injure," case authority addresses the issue.

Courts have been clear that the precise meaning of "malice" depends on the context in which it is used. See, e.g., New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964) (public official may not recover for defamatory falsehood relating to his official conduct unless statement is made with actual malice, *i.e.*, "knowledge that it was false or with reckless disregard of whether it was false or not."). In the consumer protection context, the Fourth Circuit has defined "malice" (although not willfulness) as being proven only if a "defendant acted with ill will toward the plaintiff or acted recklessly or wantonly, meaning with conscious indifference toward the plaintiff's right." Beattie v. Nations Credit Fin. Servs. Corp., 69 Fed. Appx. 585, 591 (4th Cir. 2003) (unpublished) (citing South Carolina law for the definition of "malice" in the consumer reporting context) (citaton omitted). The Supreme Court of Virginia defines "malice" in the defamation context as a communication made "with such gross indifference or recklessness as to amount to a wanton or willful disregard of the rights of a plaintiff." Preston v. Land, 255 S.E.2d 509, 511 (Va. 1979).

With regard to the "willful[ness]" element of § 1681h(e), substantial authority exists

holding that the definition of "willfulness" under § 1681n is identical to that necessary for imposing liability under § 1681h(e). See Cushman v. Trans Union Corp., 115 F.3d 220, 229 (3d Cir. 1997) (assuming, without deciding, that the requirements for willfulness under §§ 1681n and 1681h(e) are the same);[3] Lawrence v. Trans Union L.L.C., 296 F. Supp. 2d 582, 590-91 (E.D. Pa. 2003) (same). As the Fourth Circuit has noted, to prove "willfulness" under the FCRA, the consumer must show that the defendant "knowingly and intentionally committed an act in conscious disregard for the rights of the consumer." Ausherman v. Bank of Am. Corp., 352 F.3d 896, 900 (4th Cir. 2003) (quoting Dalton v. Capital Associated Indus., Inc., 257 F.3d 409, 418 (4th Cir. 2001)).

**A. The 001 Account**

As to the 001 Account, the Plaintiff appears on the one hand to agree with BB&T's assertion that it did not report any adverse history regarding the Account, while on the other hand, the Plaintiff alleges that BB&T either reported as of May 2004 that the Account had been ninety days past due before being closed, or that it was thirty days late when it was closed in November 2003. (Pl.'s Mem. at 6, 21).[4] In any event, even assuming for purposes of summary

---

[3] The court notes, as did the Third Circuit in Cushman, that the Eighth Circuit has held that malice or willful conduct under § 1681h(e) involves a "higher requirement of proof" than a willful violation under § 1681n. See Thornton v. Equifax, Inc., 619 F.2d 700, 706 (8th Cir. 1980). However, the Third Circuit did not adopt the Thorton holding because neither party in Cushman had argued for such a "higher requirement of proof" for a § 1681h(e) violation. As in Cushman, neither BB&T nor the Plaintiff have suggested an alternative standard for "malice or willful intent to injure."

[4] Trans Union claims it reported the status of the 001 Account according to the information provided to it by BB&T, implying that it [Trans Union] did not make any mistakes in reporting the 001 Account credit history. (Pl.'s Mem., Ex. A (Little Dep.) at 15:2-12.) Additionally, Experian was reporting the same information for the 001 Account as Trans Union, prior to June 2004. (Pl.'s

judgment analysis (where the court must view the record and draw all reasonable inferences in favor of the non-moving party) that BB&T provided inaccurate, adverse information on the Account, there is no evidence that such action involved the degree of willfulness or malice necessary to sustain a claim for violation of § 1681h(e). What the undisputed evidence *does* establish is that BB&T responded to the ACDV regarding the Account that was generated as a result of the Plaintiff's complaint to the CRA by confirming that any derogatory information was inaccurate.[5] (Little Dep. at 14:9-11, 15:6-25; Ex. B at TU1-TU3, TU10.) The necessary element in the Plaintiff's defamation claim of demonstrating willfulness or malice requires more than what, if true, appears to have been only inadvertent error. To be sure, neither party disputes that the Plaintiff made timely payments on the 001 Account, and directly to BB&T. The only genuine dispute involving the 001 Account concerns whether BB&T furnished negative information regarding Plaintiff's timely payments. But even given the issue, there is no evidence in the record tending to show that even if BB&T did in fact publish the inaccurate information, that it did so with "malice or willful intent to injure" the Plaintiff, an indispensable element for imposing liability under § 1681h(e). A furnisher's inadvertent mistake – indeed, its own "simple" negligence – in reporting a consumer's information to a CSA cannot form the basis of a defamation claim under § 1681h(e). See McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988) ("The word 'willfully' is widely used in the law, and...it is generally understood to refer to conduct that is not merely negligent."). Indeed, Congress has sought to preempt these very sort

---

Mem., Ex. C.)

[5]Although BB&T initially responded by citing an incorrect closing date for the account, it later corrected the error and the impact of having reported a different closing date of the loan is of no material significance. (Pl.'s Ex. B, TUI-TU3, TU10.)

of claims. Accordingly, partial summary judgment is appropriate as to the claim that BB&T willfully violated § 1681h(e) in regard to the 001 Account.

**B. The 002 Account**

However, the situation (and evidence) regarding the 002 Account is sufficiently distinguishable to preclude dispositive relief. It is undisputed that BB&T provided derogatory information regarding the Account to the CRAs, namely, that payment was late (over ninety days), that the Account was closed ("written off") as a result, and that the collateral (Second Montero) had been repossessed. (Findings ¶ 26.) BB&T asserts that placing the 002 Account in a default status was "technically accurate," or, at the very least, it did so in a good faith belief that its actions were justified so as to preclude any finding that it willfully or maliciously disregarded the Plaintiff's interest in violation of § 1681h(e). (BB&T's Mem. at 13.) This is so, BB&T contends, because the Plaintiff received BB&T's March 8, 2004 demand letter (indicating payment was due on the 002 Account), and thereafter he refused to make any of the monthly payments. BB&T reasons that any report to the CRAs of Plaintiff's default regarding the 002 Account cannot be considered "malici[ous] or willful" under § 1681h(e) because the reports contained true facts, *i.e.*, that the Plaintiff had failed to make his payments, and that the Plaintiff's vehicle had been repossessed because of the failure to make the payments. However, if the bank violated its own procedures in regard to its handling of the Account, then the issue of whether it was so reckless in doing so as to amount to a willful or malicious disregarding of the Plaintiff's interests would arise and necessarily preclude the awarding of dispositive relief.

BB&T's basic procedure was to "book" a loan within a reasonable time (ten days) of

being assigned it from a dealer, establish an account in the process and forward a payment coupon book to the consumer, notify the consumer of a missed payment after the expiration of ten days from the due date, place the loan in a default status and demand full payment if no payment was made, report the loan to the CRAs as thirty days past due and in default if the consumer had still not paid, and finally repossess the collateral, if necessary, to apply toward satisfaction of the indebtedness. (Finding ¶ 27.)[6] However, with respect to the Plaintiff's situation, BB&T did not follow this procedure because it did not book the Plaintiff's loan and set up the Account until months after the loan was assigned to it, and the Plaintiff was therefore unable to make the initial payments[7] that formed the basis for BB&T declaring the Account in default and demanding full payment – including late fees and related penalties – only four days after finally booking the loan. (Pl.'s Mem. at 7, 10-12; BB&T's Mem., Ex. 4 at 3, Ex. 5; BB&T's Reply at 7-8.) As a result, and after the Plaintiff declined to pay the late fees and related penalties for the initial payments he claims he attempted to make and which BB&T had refused,

---

[6]The deposition of Thomas Holben, a BB&T loan officer, provides details of BB&T's processes regarding booking a loan, setting up an account, and its other credit procedures. (See Holben Dep. at 29:1-24, 31:10-25, 35:21-25, 36:1-10, 79-80.) Also, the financial agreement regarding the Second RISC identifies which provisions govern when a loan may be declared to be in default. (BB&T's Mem., Ex. 4 at 3). Provision 3(b) of the agreement defines "default" as any payment that is paid more than ten days late or not at all. (Id.) The agreement also provides that late fees are assessed if a payment is not received within seven days of the due date. (Id.)

[7]The Plaintiff suggests that the second RISC was never assigned to BB&T until sometime after the January 6, 2004, payment due date and, therefore, the Plaintiff was not indebted to the bank until after the first payment. (Pl.'s Mem. at 22.) However, the Plaintiff has not presented any evidence to rebut his admission that he thought BB&T was assigned the loan. Moreover, Holben (the BB&T loan officer) testified in his deposition that the loan had, in fact, been assigned to BB&T. (Pl.'s Ex. H, Saunders Dep. 35:17-20; Pl.'s Ex. I, Holben Dep. 8:13-18.) The Plaintiff attempted to make the payments in any event and BB&T refused to accept them because the loan was not yet entered into the bank's system. (Pl.'s Mem. at 25.)

BB&T reported to the CRAs that payment on the Account was over ninety days late, that the loan was in default, and, ultimately, that the collateral had been repossessed and the Account "charged [or] written off." (Findings ¶¶ 16, 26.)

The Plaintiff argues that BB&T's refusal to accept his tender of the initial payments constitutes a waiver of his contractual obligation to make timely payment. (Pl.'s Mem. at 25.) BB&T asserts in response that even if the doctrine of waiver applies to the first two missed payments,[8] its demand for payment after the loan was booked the following month (March) revoked any earlier waiver and required the Plaintiff to make up all payments within a reasonable time. (BB&T's Reply at 8.) See Fant v. Thomas, 108 S.E. 847, 850 (1921) ("Where a party to a contract waives a default in its terms, he cannot again establish his right to proceed strictly thereunder until he has given *due notice* of his intentions to the other party.") (emphasis added). Although there is support for BB&T's position concerning payment of the base amounts of the missed payments within a reasonable time after its demand of March 8, it could not assess additional interest, levy a late payment penalty, or declare the loan in default for the Plaintiff's refusal to pay the additional amounts. See 13 Sarah H. Jenkins, Corbin on Contracts, § 67.6 (Joseph M. Perillo ed., Rev. ed. 2006); see also Multach v. Adams, 418 So. 2d 1254, 1255 (Fla. Dist. Ct. App. 1982) ("The refusal to accept proper tender will prevent the collection of interest or other damages because the failure to receive payment is due to the promisee's own action.").

At the very least, BB&T's report to the CRAs regarding the 002 Account was misleading, if not inaccurate, and a clear purpose of the FCRA must be viewed to preclude such a

---

[8] The first two payments on the 002 Account were due in early January and February 2004, respectively.

misconception of a consumer's credit history. See 15 U.S.C. § 1681s-2(a) (stating that a furnisher has a duty to provide *accurate* information to the CRAs). At most, the only adverse information that BB&T could have noted in its April report to the CRAs was that payment following the March demand was thirty days late causing the loan to be placed in a default status with a demand for accelerated payment. However, BB&T's report that payment was over ninety days past due with penalties being assessed for the Plaintiff's failure to pay the January and February amounts was certainly misleading, if not simply inaccurate. In addition, where BB&T's asserted basis for placing the loan in a default status by its letter demand of March 8 was based on an inaccurate assessment of the situation, its subsequent repossession of the vehicle was also improper. Accordingly, and especially given the history of negotiations between the Plaintiff and BB&T upon the Plaintiff's receipt of the demand letter of March 8, a factfinder could conclude that BB&T's subsequent inaccurate/misleading report to the CRAs regarding the 002 Account was done willfully so as to preclude dispositive relief in favor of the bank with regard to the alleged violation of § 1681h(e).

**II. The FCRA Claim**

A furnisher of credit information such as BB&T has the obligation pursuant to 15 U.S.C. § 1681s-2(b) to perform a proper, *i.e.*, reasonable, investigation[9] upon receipt from a CRA of notice (ACDV) of a consumer's complaint disputing information provided by the furnisher and disclosed in the consumer's credit report. The Plaintiff filed a dispute in June 2004 in which he

---

[9] "Investigation," for purposes of the FCRA, "requires some degree of careful inquiry" by creditors and furnishers of a consumer's credit information. Johnson v. MBNA Am. Bank, N.A., 357 F.3d 426, 430-31 (4th Cir. 2004) (noting also that the investigation must be "reasonable").

asserted that the information being reported concerning the 002 Account was inaccurate. (Findings ¶ 25.) The CRAs sought verification of the information that the information was correct and BB&T confirmed the information, despite the history of the Account that it no doubt possessed in its own files. (Id.) A jury could conclude that BB&T's failure to accurately reflect the Account's history, or any failure to access its history if it was not readily available, rendered its perfunctory response to the CRA inquiry unreasonable and improper in violation of the furnisher's obligations as mandated by § 1681s-2(b)(1)(A) (conduct an investigation concerning disputed information) and (B) (review relevant information provided by the CRA). Dispositive relief, therefore, is not available to resolve the issue because a genuine dispute of material fact exists.

BB&T also argues that the Plaintiff is, in effect, improperly collaterally attacking the accuracy of his credit report such that his claim is not one for violation of the FCRA. (BB&T's Mem. at 14.) BB&T cites Wadley v. Equifax Info. Servs., L.L.C., 396 F. Supp. 2d 677 (E.D. Va. 2005), and Dauster v. Household Credit Servs., Inc., 396 F. Supp. 2d 663 (E.D. Va. 2005), in support of its position. However, those cases are inapposite to the Plaintiff's situation because the dispute in each of those cases was not about financing requirements, but about the objects of the respective loans (a car in Wadley and a couch in Dauster) that were financed and whether the products were defective. The debtors in those cases had, if anything, a warranty claim against the sellers, but they were still obligated, regardless of any warranty claim, to continue to make payments to the entities that had financed the purchases. Because the debtors were not contesting the financing arrangements, the court concluded that each was only collaterally attacking the accuracy of the information that was reported to the CRAs. Wadley, 396 F. Supp. 2d at 679-80;

Dauster, 396 F. Supp. 2d at 665. The debtors were not contesting that the creditors did not have the legal right to declare their respective accounts delinquent because each debtor stopped making payments, and so the creditors correctly reported to the CRAs that the debtors involved had ceased paying their required obligations. Unless a governing financial agreement contains a provision that allows a debtor to suspend payment if a dispute arises with a seller over whether the subject matter that is financed is defective, a debtor does not have a contractual right to stop payments. Here, the FCRA dispute is not over the product purchased (the Second Montero), but rather over the financing arrangements and the resulting history reported to the CRAs by BB&T as a furnisher of credit information. Therefore, the Plaintiff's challenge is not a collateral attack on the accuracy of the reported derogatory information of the 002 Account, but a direct challenge to its accuracy in that BB&T did not have the legal right to declare the loan in default and thereby provide the false, derogatory information concerning the Account.

**III. UCC Article 9 Claim**

Count III of the Plaintiff's Complaint alleges that BB&T improperly repossessed the Second Montero. (Compl. ¶ 34.) The issues are: (1) whether the Defendant had a right to repossess the Second Montero; and (2), if so, whether the disposal of the car was "commercially reasonable" as required by the UCC.

Pursuant to Va Code Ann. § 8.9A-609(a)(1),[10] a secured party may take possession of the collateral after default, with the financing agreement between the two parties dictating the

---

[10] Virginia has adopted Article 9 of the Uniform Commercial Code. See Va. Code Ann. § 8.9A-101 et seq.

circumstances giving rise to a default. In this case, BB&T declared that the Plaintiff's loan (the Second RISC) was in default in the March 8, 2004, demand letter sent to the Plaintiff. (Findings ¶ 16.) The bank stated in the letter that it had used the missed January payment as the "trigger" for declaring default. However, BB&T did not have the right to declare the Plaintiff's loan in default as of that time (January) and, accordingly, if BB&T did not have the right to declare the loan in default for the alleged missed January payment, then the Second Montero was wrongfully seized in the repossession, and the issue of whether or not its sale was "commercially reasonable" or not is never reached.[11]

With regard to the issue involving the disposition[12] of the car, the Plaintiff argues that BB&T's use of a dealer-only auction to sell the vehicle and its use of an industry wholesale price for the vehicle was not "commercially reasonable" as required by the UCC. See Va. Code Ann. § 8.9A-610(b); See also Charles E. Brauer Co. v. NationsBank of Virginia, N.A., 466 S.E.2d 382, 386 (Va. 1996) (noting that when default occurs, the secured party may "dispose" of the collateral "by public or private proceedings and that every aspect of the disposition including *the method, manner, time, place and terms must be commercially reasonable*.") (internal quotation marks and citation omitted) (emphasis added). The creditor, here BB&T, has the burden of

---

[11] Even though there is no motion for dispositive relief before the court at present as to whether BB&T had the right to repossess the Second Montero at any stage in the sequence of events, dispositive relief may nevertheless be precluded depending on whether there is a genuine issue of disputed material fact as to whether there were additional, valid reasons for the repossession.

[12] The vehicle in this case was "disposed" of when BB&T sold it at the Virginia Auto Auction for $15,900. Although the term "disposition" is not defined in the U.C.C., the Supreme Court of Virginia has interpreted the word (in the context of Article 9) to mean "an actual transfer of an interest in the collateral by *sale*, lease, or contract." Charles E. Brauer Co. v. NationsBank of Virginia, N.A., 466 S.E.2d 382, 386 (Va. 1996) (citing General Elec. Capital Corp. v. Vashi, 480 N.W.2d 880, 881 (Iowa 1992) (emphasis added)).

proving commercial reasonableness of the disposition of the collateral. <u>Woodward v. Resource Bank</u>, 436 S.E.2d 613, 617 (Va. 1993) (citations omitted).

A disposition of collateral is made in a "commercially reasonable" manner if the disposition is made:

> (1) in the usual manner on any recognized market;
>
> (2) at the price current in any recognized market at the time of the disposition; or
>
> (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

Va. Code Ann. § 8.9A-627(b)(1)-(3). A "recognized market" is one in which "the items sold are fungible and prices are not subject to individual negotiation." Va. Code Ann. § 8.9A-610 cmt. 9 (citing the New York Stock Exchange as an example of a "recognized market"); Va. Code § 8.9A-627 cmt. 4 (adopting the definition of "recognized market" in § 8.9A-610 and noting that the term only applies to "markets in which there are standardized price quotations for property that is essentially fungible, such as stock exchanges"). In contrast:

> [a] market in which prices are individually negotiated...is not a recognized market, even if the items are the subject of widely disseminated price guides or are disposed of by *dealer auctions*.

Va. Code § 8.9A-610 cmt. 9 (emphasis added). Although § 8.9A-627(b)(1) and (2) may preclude the finding, as a matter of law, that the sale of the vehicle at a dealer-only auction is a "commercially reasonable" disposition, there is the disputed issue in this case of whether the sale was "in conformity with reasonable commercial practices among dealers" of automobiles similar

to the one sold in this case. See Va. Code Ann. § 8.9A-627(b)(3). A genuine issue of material fact with respect to whether the sale of the vehicle was, in fact, "commercially reasonable" therefore remains that precludes dispositive relief.

BB&T placed the Second Montero in a dealer-only auction on May 27, 2004, in which the car was sold for $15,900, which was less than the total amount the Plaintiff owed on the loan. (Findings ¶¶ 22-23.) The Plaintiff asserts that BB&T's disposition of the car was commercially unreasonable because the wholesale price at which the car sold resulted in a large deficiency on the indebtedness; the sale of the car was not adequately ("reasonably") advertised; the bank failed to solicit non-auction bids for the car; the rapid timing of the disposition is suspect; and there is a question of whether the auction procedures that were utilized were otherwise reasonable. (Pl.'s Mem. at 44-47.) BB&T offers statements from representatives of BB&T and the auction facility in support of its motion for summary judgment that describe the advertising practices that were utilized, the estimated number of bidders present at the auction, and the average wholesale value of the same vehicle.[13] However, whether these factors when considered individually, or in combination, rendered the disposition of the repossessed vehicle reasonable is clearly a disputed factual issue that must be resolved by the factfinder. See Jack F. Williams, *Debunking the Myth Engulfing Article 9 Collateral Dispositions*, 9 Am. Bank. Inst. L. Rev. 703, 707 and n.19 (2001) (citing numerous cases and concluding that "commercial reasonableness is generally a question of fact for the jury and not of law for the court.") Therefore, the Defendant's motion for summary judgement on the commercial reasonableness of the disposition of the Second Montero

---

[13]The Plaintiff challenges the admissibility of such evidence in the motion to strike, but the objections are rendered moot and do not have to be addressed in light of the denial of dispositive relief.

must be denied.[14]

## CONCLUSION

The court must grant Defendant BB&T's motion for summary judgment on the claim related to the 001 Account because the Plaintiff has not established that a genuine issue of material fact exists that the Defendant willfully reported inaccurate or even misleading information. However, the court must, at the same time, deny dispositive relief on all claims related to the 002 Account because the Plaintiff has identified and sufficiently substantiated several genuine issues of disputed material fact relative to the issue of BB&T's reporting of the derogatory information concerning the Account to the CRAs and whether BB&T wrongfully repossessed and/or disposed of the vehicle in a commercially reasonable fashion. As to the Plaintiff's motion to strike various affidavits and other proposed evidence submitted by BB&T in support of its request for summary judgment, the court having denied such relief as to all claims but that involving the 001 Account in regard to which there is no perceived dispute as to the material facts so as to require a more proper submission of substantiating evidence, the motion to strike is rendered moot and the motion must therefore be denied.

An appropriate Order shall issue.

_____/s/_____
Dennis W. Dohnal
United States Magistrate Judge

---

[14] Of course, if it is determined that BB&T did not have the legal right to declare the Plaintiff's loan in default and to repossess the vehicle, then the issue of the reasonableness of the disposition will be rendered moot because BB&T may be liable for a higher value of the vehicle regardless of the reasonableness or unreasonableness of the auction sale.

Dated: 10/3/06