# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| **REX RICHARD SAUNDERS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL NO. 3:05CV731** |
| ) | |
| **EQUIFAX INFORMATION** ) | |
| **SERVICES, L.L.C.,** *et al.***,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## <u>MEMORANDUM OPINION</u>

This matter is before the Court on the Defendant, Branch Banking & Trust Company of Virginia's ("BB&T"), post-trial Motion for Remittitur ("BB&T's Mot.") pursuant to Federal Rule of Civil Procedure 59,[1] and accompanying Memorandum ("BB&T's Mem.") in support thereof (docket entry nos. 74-75). The Court will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and argument would not aid the decisional process. The matter is therefore ready for resolution.

### Procedural Background

The case involves multiple claims by the individual Plaintiff, Mr. Rex Saunders ("Saunders" or the "Plaintiff"), against BB&T and several credit reporting agencies (CRAs) concerning the reporting of derogatory credit information by BB&T to the CRAs following

---

[1]The Plaintiff does not challenge BB&T's use of Rule 59 to seek remittitur. Nor does the Court.

Saunders' nonpayment on an automobile loan obtained from BB&T. The central claims were based on alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, with additional state pendant claims being asserted for defamation and the alleged wrongful repossession of the vehicle that secured the loan. *See* Compl. ¶¶ 22-45. Saunders sought actual, statutory, and punitive damages as well as attorney's fees and costs. *Id.* The claims against the CRAs were settled by agreement of the parties prior to trial (docket entry nos. 19 and 21) and, accordingly, the CRAs were dismissed as parties to the case at that juncture.

With regard to BB&T, the wrongful repossession and defamation claims were also resolved by the parties before or during trial (before submission to the jury), leaving as the sole issue for the jury's consideration whether BB&T, as a furnisher of the credit information, willfully violated the FCRA. *See* 15 U.S.C. § 1681s-2(b) (outlining duties of furnishers of information) and § 1681n (authorizing damages for willful violations of the FCRA). Following a two-day trial, the jury awarded Saunders one thousand dollars ($1,000) in statutory damages and eighty thousand dollars ($80,000) in punitive damages pursuant to 15 U.S.C. § 1681n(a)(1)(A) and (a)(2).[2]

In its remittitur motion, BB&T seeks to have the award of punitive damages reduced to no more than four times the statutory damages (*i.e.*, $4,000) on the basis that the jury's award is unconstitutionally arbitrary and excessive. (BB&T's Mem. at 14.) The Plaintiff opposes the motion, arguing that the award was justified given the degree of reprehensibility of BB&T's misconduct; the fact that there is no defined constitutional ratio for awarding punitive damages in

---

[2] The issue of attorney's fees and costs was subsequently taken under advisement by the Court, with the agreement of the parties, pending the conclusion of all proceedings, including any appeal. *See* Consent Order, Dec. 14, 2006 (docket entry no. 76).

FCRA cases; the award is consistent with verdicts awarding punitive damages in other FCRA

cases that necessarily involve large disparities between the actual and/or statutory damages

awarded and the award of punitive damages; and that the very purpose of punitive damages – to

punish and deter others – would be defeated if BB&T's Motion were granted.  *See generally* Pl.'s

Mem. Opp'n BB&T's Mot. for Remittitur ("Pl.'s Mem.") (docket entry no. 77).

## ANALYSIS

**1.  *Evidence Submitted to the Jury***

The jury was instructed as to all aspects for awarding punitive damages, including the fact

that such an award was entirely within its discretion and that punitive damages could only be

awarded if it found that BB&T willfully violated the Plaintiff's rights under the FCRA.  The jury

was also instructed as to the purpose of awarding punitive damages and the salient factors that

they could consider in making any award:

> If you choose to assess punitive damages against a Defendant under the Fair
> Credit Reporting Act, you may consider the following factors in assessing
> the award:
>
> a) The remedial purpose of the Fair Credit Reporting Act;
> b) The harm to consumers intended to be avoided or corrected by this Act's
>    requirements;
> c) The manner in which the Defendant conducted its business;
> d) The length of time before the Defendant corrected its mistake;
> e) The degree of notice provided to the Defendant about its mistake;
> f)  Defendant's awareness of the mistake; and
> g) The Defendant's income and net worth.

Jury Instruction No. 16.

Perhaps most significantly, at least for purposes of resolving the instant motion, the jury

was also specifically cautioned that any award of punitive damages could not be based on any

factor other than "calm discretion and sound reason," and that there had to be some "rational

relationship between punitive damages, if you elect to award any, and the plaintiff's actual damages":

> You should bear in mind not only the condition under which and the purpose for which the law permits an award of punitive damages to be made, but also the requirement of the law that the amount of such punitive damages must be fixed with calm discretion and sound reason, and must never be either awarded or fixed in amount because of any sympathy, bias or prejudice with respect to any party.  You may consider the defendant's net worth in connection with punitive damages.  And also under the law there should be a rational relationship between punitive damages, if you elect to award any, and the plaintiff's actual damages.

Jury Instruction No. 15.

Evidence presented to the jury in support of the Plaintiff's request for punitive damages included such circumstances[3] as the fact that the Plaintiff was not given a payment coupon book within a reasonable period after consummation of the loan in contravention of BB&T's own internal procedures; that the Plaintiff made repeated attempts to address the situation, including attempting payment, knowing that he was obligated on the loan, yet was rebuffed each time and was told that he did not have a loan with BB&T; that the Plaintiff received a copy of the title for the vehicle that did not indicate the existence of any liens related to any loan; that the Plaintiff was sent a letter by BB&T demanding full payment of the entire loan, with interest and penalties, within a few days after the bank finally discovered it had extended the loan to the Plaintiff ("booked the loan"); that, after concluding that the Plaintiff had defaulted on his loan payments, BB&T acquired possession of the car and sold it thereafter at auction (the "repossession"); and

---

[3]As more fully discussed and outlined in the Court's earlier Memorandum Opinion granting partial summary judgment with which the trial evidence was consistent in essential part.  (Mem. Op., Oct. 3, 2006, at 3-5.)

that BB&T confirmed the adverse credit information concerning the Plaintiff to the CRAs and added additional derogatory information without at least also noting that the information was disputed by the Plaintiff.  (Mem. Op., Oct. 3, 2006, Undisputed Material Facts ¶¶ 7-8, 10-18, 25-26.)[4]  The parties also stipulated that the net worth of BB&T was $3,271,115,000, and that fact was presented to the jury for its consideration by trial exhibit and without, to the Court's recollection, direct reference or undue emphasis in opening or closing argument.  (Pl.'s Ex. 53.) The Plaintiff offered his own testimony in support of his claim for actual damages and testified, for example, that he had to pay cash for a house addition rather than obtain a loan at a favorable rate, but no supporting documentation or corroborative evidence was introduced in any effort to quantify and substantiate any actual damages; rather, Plaintiff's counsel obviously focused on the alternative of statutory damages as a predicate for the award of punitive damages.[5]

BB&T offered evidence to the effect that they immediately alerted the Plaintiff in advance of formally "booking the loan" when representatives had confirmed the existence of the loan, and that they attempted to accommodate the situation by deferring payment of the nominal amount of interest and penalty to the end of the loan period, but the Plaintiff refused to take any

---

[4]Additional evidence of the repossession of the vehicle and the circumstances surrounding its sale at auction that the Plaintiff alleged to be commercially unreasonable was not presented to the jury because the claim relating to the repossession was resolved by settlement before trial.  Rather, the parties simply stipulated, and the jury therefore was able to consider, that BB&T sold the car at an auction, such stipulation necessarily inferring that BB&T re-took possession of the automobile before the sale.  *See* Stipulation, Tr. Ex. 52, at ¶ 21.

[5]Interestingly, the jury instruction regarding the necessity of a rational relationship between actual damages and punitive damages in order to justify the latter should have also included the alternative predicate of statutory damages, but the omission presumably favored BB&T where the jury did not find any actual damages and yet nevertheless awarded the maximum amount of possible statutory damages in apparent alarm over the Defendant's "misconduct."  *See* Jury Instruction No. 15.

action to mitigate the situation.  In essence, BB&T's position was that the reporting of the

adverse credit information to the CRAs was factually accurate and that whatever mistakes were

made in processing and administering the loan were the result of negligent, but not willful

misconduct.  The jury obviously rejected the defense evidence and related argument.

**2.  *Statutory Damages Alone May Justify an Award of Punitive Damages Under the FCRA***

The FCRA provides for an award of punitive damages for willful noncompliance with its

provisions in such amount "as the court may allow."  15 U.S.C. § 1681n(a)(2).  The Act allows

for such an award predicated on either sufficient proof of actual damages or, in the alternative, an

award of statutory damages.  *See, e.g.*, Yohay v. Alexandria Employees Credit Union, Inc., 827

F.2d 967, 972 (4th Cir. 1987) (an award of actual damages is not necessary to support an award

of punitive damages under the FCRA); Owner-Operator Indep. Driver Ass'n, Inc. v. USIS

Commercial Servs., Inc., 2006 U.S. Dist. LEXIS 52331, at *6 (D. Colo. July 31, 2006) ("...a

plaintiff who has proven that the defendant willfully failed to comply with the FCRA may

recover statutory and punitive damages without proof of actual damages.").  Therefore, the jury's

$1,000 statutory damages award properly allowed the jury to consider and then render an award

of punitive damages for any willful violation of the FCRA.

**3.  *Punitive Damages Generally***

Compensatory and punitive damages serve different purposes.  While compensatory

damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the

defendant's wrongful conduct," State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416

(2003) (citations omitted), punitive damages, by contrast, serve a broader function aimed at

deterrence and retribution, *id.* (citation omitted).  With respect to the latter, the Due Process

Clause of the Fourteenth Amendment prohibits the imposition of "grossly excessive or arbitrary punishments" on a tortfeasor.  *Id.*  Although the Supreme Court has emphasized that punitive damage awards violate due process when they constitute an arbitrary deprivation of property, the Court has repeatedly "decline[d] [] to impose a bright-line ratio which a punitive damages award cannot exceed."  *Id.* at 425; BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 582 (1996) ("We have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award.") (citation omitted and emphasis removed).  And, while the Supreme Court has cautioned, as emphasized by BB&T, that a punitive damages award of more than four times the amount of compensatory damages might be close to the line of "constitutional impropriety," Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23-24 (1991) (upholding punitive damages award of "more than 4 times the amount of compensatory damages...more than 200 times [the plaintiff's] out-of-pocket expenses" and "much in excess of the fine that could be imposed"); *see also* State Farm, 538 U.S. at 425 (noting that few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process),[6] the Court has nonetheless upheld

---

[6] Perhaps because traditional elements of due process are flexible, the Supreme Court has, in fact, overturned only two punitive damages awards because of their size.  Each of them exceeded by a multiple of more than 100 the amount of compensatory payments necessary to compensate a plaintiff or the actual harm caused by the defendant's misconduct.  *See*, *e.g.*, Gore, 517 U.S. at 582-83 (striking down a 500 to 1 ratio); State Farm, 538 U.S. at 425, 429 (reversing award with ratio of 145 to 1).

ratios of 5:1,[7] 118:1,[8] and 526:1.[9]  Moreover, neither the Supreme Court nor Congress has found

it appropriate or necessary to impose a limit on punitive damages awards in the FCRA context,

including claims based on willful violations of the Act, but for the statutory limit for agency

action, *see* 15 U.S.C. § 1681s(a)(2)(A) (maximum civil penalty the Federal Trade Commission

may seek for knowing violations of the FCRA is $2,500 per violation, but the limit is *not*

applicable to actions brought under the FCRA by private citizens).  Other statutory provisos

authorizing statutory damages, but which also limit the aggregate award to any class, include

both the Fair Debt Collection Practices Act and the Truth in Lending Act which state that total

recovery may not exceed "the lesser of $500,000 or 1 per centum of the net worth of" a debt

collector or creditor.  *See* 15 U.S.C. § 1692k(a)(2)(B)(ii) (FDCPA); 15 U.S.C. § 1640(a)(2)(B)

(TILA).[10]  Nevertheless, the FCRA lacks such "caps" for private actions brought by aggrieved

consumers.

**4.  *The Supreme Court's Constitutional Framework for Evaluating Punitive Damages Awards***

Even though Congress has not imposed limits on an award of punitive damages in the

area of consumer protection legislation, and even though the Supreme Court has not established a

bright line constitutional ratio to be applied, the Court is nevertheless required to consider "three

---

[7] Honda Motor Corp. v. Oberg, 512 U.S. 415, 430 (1994).

[8]  Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 260-62 (1989).

[9] TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 453 (1993) (affirming state court award "526 times greater than the actual damages awarded by the jury").

[10]And Congress is certainly not hesitant to dictate parameters in the criminal justice arena as demonstrated by numerous mandates of minimum mandatory sentences for the commission of various crimes.

guideposts"[11] in reviewing the $80,000 punitive damages awarded in the case: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.  State Farm, 538 U.S. at 418 (citation omitted).  Stated simply, an award of punitive damages must be based on the facts and circumstances of the defendant's misconduct and the harm caused to the plaintiff by such misconduct such that the measure of punishment is both reasonable and proportionate to the amount of harm caused and the general damages recovered.  See id. at 425-26.

A. *The Degree of Reprehensibility of BB&T's Misconduct*

Of the three considerations identified by the Court in State Farm, "[t]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."  *Id.* at 419 (citation omitted).  The Supreme Court has instructed courts generally to determine the reprehensibility of a defendant's conduct in light of whether:

> [1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability;[12] [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.  The existence of any one of these

---

[11] The Supreme Court does not say that these are the only guideposts that a lower court may consider in evaluating the constitutionality of a punitive damages award. See Gore, 517 U.S. at 606 (Scalia, J., dissenting) ("The Court nowhere says that these three 'guideposts' are the only guideposts.").

[12] This factor is particularly relevant when the harm inflicted is economic in nature. *See* Gore, 517 U.S. at 576 (explaining that the "infliction of economic injury, especially when done intentionally...or when the target is financially vulnerable, can warrant a substantial penalty").

> factors weighing in favor of a plaintiff may not be sufficient to sustain a
> punitive damages award; and the absence of all of them renders any
> award suspect.  It should be presumed a plaintiff has been made whole
> for his injuries by compensatory damages, so punitive damages should
> only be awarded if the defendant's culpability, after having paid
> compensatory damages, is so reprehensible as to warrant the imposition
> of further sanctions to achieve punishment or deterrence.

*Id.* (citing <u>Gore</u>, 517 U.S. at 575,576-77).[13]  In evaluating the reprehensibility prong, this Court is

mindful of the fact that a defendant should be punished "for the conduct that harmed the plaintiff,

not for being an unsavory individual or business."  <u>State Farm</u>, 538 U.S. at 423.  At the same

time, the factors identified in the <u>State Farm</u> and <u>Gore</u> jurisprudence have only marginal

relevance in the context of a consumer action.

Specifically, in FCRA cases, the first two factors in the <u>State Farm</u> reprehensibility

evaluation, namely whether the harm was physical as opposed to economic and whether the

conduct evinced an indifference or reckless disregard for the health and safety of others, are not

typically present because violations of the Act usually result in "only" adverse economic, as

opposed to physical, harm to consumers in the form of adverse credit ratings, the inability to

obtain financial backing from various economic institutions, actual out-of-pocket losses, mental

distress or even, as was the case here, repossession of a consumer's collateral.  While it is

acknowledged that neither <u>State Farm</u> nor <u>Gore</u> involved elements of physical harm or threats to

the health and safety of others, and yet the Supreme Court still included such factors in its

punitive damages analysis, those particular factors must be placed in proper perspective

_____

[13]With reprehensibility, this Court is well aware that the jury may not award punitive
damages to punish and deter conduct that bears no relation to a plaintiff's harm.  *See* <u>State Farm</u>, 538
U.S. at 422.  "A defendant's dissimilar acts, independent from the acts upon which liability was
premised, may not serve as the basis for punitive damages."  <u>Id.</u> at 423.

depending on the particular context of each application.  Thus, the first two factors in the State Farm reprehensibility analysis must be given less, or no weight than the remaining factors.  As to the third factor, the evidence was sufficient to establish that Saunders was a financially vulnerable victim; and with respect to the fourth factor, no evidence was introduced that would support a finding that BB&T's conduct was part of ongoing misconduct with other consumers.

Lastly, although BB&T's conduct was likely reckless, it was not intentionally malicious or deceitful.  But, similar to the first and second factors of the reprehensibility analysis, whether a defendant's misconduct was the product of intentional malice, trickery, or deceit, *see* State Farm, 538 U.S. at 419, is not a critical factor to the reprehensibility analysis employed here.  That is because in FCRA cases, punitive damages may be awarded for noncompliance with its provisions even when a defendant does not exhibit malice or evil motive in violating the Act. *See* Dalton v. Capital Associated Indus., Inc., 257 F.3d 409, 418 (4th Cir. 2001); Cousin v. Trans Union Corp., 246 F.3d 359, 372 (5th Cir. 2001) ("Malice or evil motive need not be established for a punitive damages award [in FCRA cases], but the violation must have been willful.") (citation omitted).  If the FCRA expressly contemplates a punitive damages award even where a defendant does *not* act with malice or evil motive in violating its provisions, then the fifth factor of the State Farm reprehensibility analysis – whether the harm sustained was the result of intentional malice or deceit – is of little relevance or import in an FCRA case where the statute expressly authorizes a punitive damages award even where the factor is absent from a party's otherwise willful misconduct.

BB&T's conduct was reprehensible in other ways not necessarily contemplated by the Supreme Court's five-factor test.  This is not a case involving an isolated instance of human error

which BB&T promptly cured, or where, upon discovery, BB&T quickly took ameliorative action, as the Court essentially found it had done with a different loan involving Saunders which justified the granting of partial dispositive relief in favor of BB&T before trial. *See* Mem. Op. of Oct. 3, 2006 at 8-10. Nor is this an instance where BB&T can defend itself by simply claiming it relied on information it assumed was accurate, or where it assumed its actions were lawful.

Rather, BB&T caused great financial and emotional strain to a consumer by: failing to properly "book" Saunders' loan in violation of BB&T's own internal operating procedures; repeatedly denying the existence of a contractual relationship with Saunders when such a relationship in fact existed; rebuffing Saunders when he repeatedly attempted to make proper payment on his loan and then demanding full payment of the entire loan, with interest and penalties, within a few days after BB&T finally discovered it had extended the loan; acquiring possession of the car and selling it thereafter at auction; and reporting derogatory information to the CRAs without first noting that Saunders disputed the information. Although such evidence may not satisfy all of the factors identified by the Supreme Court in State Farm, that case did not involve a consumer credit scenario and it is difficult to contemplate a more egregious set of circumstances in such a context than were present here.

**B.  *Disparity Between Actual or Potential Harm Suffered by the Plaintiff and the Punitive Damages Award***

As previously noted, the Supreme Court has been "reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and [a] punitive damages award." State Farm, 538 U.S. at 424. It is for such reason that awards exceeding a single digit ratio between punitive and compensatory damages have been upheld by the Court. Because there is no "high water mark" set for punitive damages, "ratios greater than those [the

Court] has previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." *Id.* at 425 (citation omitted). Moreover, the Court has also noted that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards." Gore, 517 U.S. at 582.

Indeed, since the issuance of the State Farm precedent, various courts have recognized that the ratio between punitive and compensatory damages may be justifiably higher where only nominal compensatory damages were awarded. *See*, *e.g.*, Fabri v. United Techs. Int'l, Inc., 387 F.3d 109, 126 (2d Cir. 2004) ("Although the State Farm Court noted that single-digit multipliers are more likely to comport with due process than awards with ratios in the range of 500 to 1, it also recognized that this proposition may not apply where the plaintiff receives an insignificant or nominal compensatory award."). Here, although the jury made only a nominal statutory award, it was nevertheless the maximum allowed under the FCRA for such damages, and the fact that the jury felt compelled to award the maximum allowable amount further supports its award of punitive damages that was but a fraction of BB&T's substantial net worth. Moreover, the $80,000 punitive damage award here is not the type of "breathtaking" award found in either Gore (500:1) or in State Farm (145:1). The punitive damages award in this case is "based upon the facts and circumstances of [BB&T's] conduct and the harm to the plaintiff." State Farm, 538 U.S. at 425. It is also worthy of note that the amount of the award in this case ($80,000) "pales in comparison" to the awards that have been approved in the other cases that exceeded a 4:1 ratio, especially in light of BB&T's net worth ($3.2 billion). *See*, *e.g.*, TXO, 509 U.S. at 451, 462 (award of $19,000 in compensatory damages and $10 million in punitive damages not "grossly excessive" even though it created a 526:1 ratio).

**C.  *The Disparity Between the Punitive Damages Award and the Civil Penalties Authorized or Imposed in Comparable Cases***

"Because the Supreme Court directs the lower courts to compare the award with civil and criminal penalties authorized and imposed rather than with civil and criminal damage awards imposed in comparable cases, the amount of punitive damages awarded in past cases is irrelevant" to this last factor in the punitive damages analysis.  *See* Bach v. First Union Nat'l Bank, 149 Fed. Appx. 354, 367 n.2 (6th Cir. Aug. 22, 2005) (unpublished)[14] (citing Gore, *supra*, 517 U.S. at 583).  The maximum civil penalty the FTC may seek for knowing violations of the FCRA is $2,500 per violation.  15 U.S.C. § 1681s(a)(2)(A).  However, since this limit is *not* applicable to actions brought under the FCRA by private citizens, it is not "particularly helpful in assessing the constitutionality of the punitive damage award."  *Id.* at 367.  Accordingly, for FCRA cases brought by private citizens, the third guidepost offers little help to this Court's punitive damages analysis.

---

[14] Recently amended Rule 32.1 of the Federal Rules of Appellate Procedure now permits a party to cite to unpublished federal court decisions for their persuasive value or for any other reason.  *See* Fed. R. App. P. 32.1, Advisory Committee Notes on 2006 Amendments.  However, the Rule only applies to unpublished opinions issued *on or after* January 1, 2007.  *Id.*  Those unpublished decisions issued *before* January 1, 2007, are governed by the local rules of the circuits.  *Id.*  As Bach was decided in 2005, its appropriateness is governed by the Local Rules of the Fourth Circuit.  Fourth Circuit Local Rule 32.1, although "disfavor[ing]" the citation of unpublished decisions, nonetheless authorizes a party to cite to such an opinion if the party believes it has "precedential value in relation to a material issue in a case and that there is no published decision that would serve as well...."  Fourth Circuit Loc. R. 32.1.  Additionally, the party submitting such an opinion should file and serve a copy of the unpublished disposition.  *See id.*  As Bach is the only decision to address the excessiveness of a punitive damages award in the FCRA context post-Gore and State Farm, the unpublished opinion undoubtedly carries "precedential value in relation to a material issue" in the present case; furthermore, BB&T has complied with the procedural prerequisites necessary for the opinion's proper filing in this case.  The Court therefore accepts BB&T's proffer of the Sixth Circuit's unpublished Bach decision and will analyze it in the context of the facts presented in this case and in light of the punitive damages award BB&T claims to be excessive.

**5.** *The Sixth Circuit's Decision in* <u>**Bach v. First Union Nat'l Bank**</u>

The Fourth circuit has not had the opportunity to utilize the <u>State Farm</u> analysis in review of an award of punitive damages in a FCRA context.[15]  However, the Sixth Circuit in <u>Bach</u> addressed the constitutionality of a punitive damages award in an FCRA case.  There, the plaintiff customer sued a bank alleging, *inter alia*, violation of the FCRA, 15 U.S.C. § 1681s-2(b).  *Id.* at 356.  The jury found that the bank willfully violated the Act and awarded the consumer $400,000 in compensatory damages and $2,628,600 in punitive damages.  *Id.*  The bank appealed, and the Sixth Circuit, applying the three <u>State Farm</u> guideposts, held that the punitive damages award (which created a ratio of 6.57 to 1) was unconstitutionally excessive.  *Id.* at 367.

In addressing the reprehensibility factor in the FCRA context, the <u>Bach</u> court noted that: (1) the plaintiff's harm was purely economic, not physical, such that the plaintiff's resulting emotional distress was "not the sort of physical injury the <u>State Farm</u> case contemplates;" (2) that where the bank's conduct was confined to the "economic realm," it could not be said that the tortious conduct demonstrated an indifference to or reckless disregard for the health and safety of others; (3) that although the plaintiff could be viewed as a "financially vulnerable victim," (4) there was no evidence of repeated FCRA misconduct committed against parties other than the

---

[15]The only Fourth Circuit decision involving the award of punitive damages in a FCRA case is <u>Yohay</u>, *supra*.  Aside from the fact that <u>Yohay</u> preceded the Supreme Court's decisions in both <u>Gore</u> and <u>State Farm</u> (and, therefore, did not incorporate the punitive damages "guideposts" delineated in those cases), the <u>Yohay</u> court's holding did not focus on the excessiveness of the punitive damages award.  827 F.2d at 972 & n.2 (addressing the alleged excessiveness of the punitive damages award in a three sentence footnote).  Rather, the issue was whether punitive damages could be awarded in the absence of proof of compensatory damage.  The case, therefore, is inapposite and otherwise of little help to the present analysis.

consumer; and (5) although the bank's conduct was not accidental, nothing in the evidence suggested that the misconduct was anything more than reckless in nature. *See id.* at 364-366.

In evaluating the size of the punitive award, the Sixth Circuit found the ratio of 6.57 to 1 to be "alarming," especially considering the fact that the award of compensatory damages was predicated on the customer's "pain and suffering." *Id.* at 366 ("This fact compel[led] the conclusion that the punitive damage award [was] duplicative, and that either a new trial on punitive damages or a remittitur of the damages awarded [was] appropriate.").

Finally, in comparing the punitive damage award with comparable civil or criminal penalties available under the FCRA, the Bach court concluded that this factor was not "particularly helpful in assessing the constitutionality of the punitive damage award." *Id.* at 367. Having examined the three guideposts, the court concluded that the punitive damage award was unconstitutionally excessive. *Id.*

This Court does not question the propriety of the Sixth Circuit's analysis in Bach. Indeed, the reasoning appears to be soundly applicable to FCRA cases where *both* compensatory and punitive damages have been awarded by a jury. *See* Gore, 517 U.S. at 582 (suggesting that large compensatory damage awards may not justify as high of a harm-to-punitive damages ratio). The present case, however, does not present the same scenario. The jury in this case, unlike that in Bach, did not award the plaintiff compensatory damages. Rather, the jury concluded that Saunders was entitled to $1,000 in statutory damages, the maximum allowed under the FCRA. Such was not the case in either State Farm or Bach where the plaintiffs were awarded substantial compensatory damages (portions of which contained a punitive element), *see* State Farm, 538 U.S. at 415 (plaintiffs awarded $2.6 million in compensatory damages); Bach, 149 Fed. Appx. at

-16-

366 ($400,000 in compensatory damages and $2.628 million in punitive damages), thereby justifying a reduction in the ultimate punitive damages award.

As noted earlier, since Saunders proved to the satisfaction of the jury that BB&T willfully violated the FCRA, he was entitled to recover punitive damages – in addition to his statutory damages – even though he lacked sufficient proof to sustain an award of actual compensatory damages. *See* Yohay, 827 F.2d at 972. To hold that a ratio of 4 to 1 in the FCRA context is constitutionally questionable where a jury's punitive damages award is premised entirely on a maximum statutory damages award would defeat the intent of Congress in enacting the FCRA, the purposes of deterrence and retribution at the heart of a punitive damages award and, finally, common sense. Indeed, where a jury's punitive damages award in a FCRA case is predicated solely on an award of statutory damages, many punitive damage awards will inevitably create ratios which far exceed the single-digit ratio the Supreme Court has said "to a significant degree" will fail to satisfy due process. *See* State Farm, 538 U.S. at 425. It is for precisely this reason that the Court has not set bright-line ratios for punitive damage awards. Moreover, the Supreme Court has also accepted the fact that "particularly egregious" misconduct that results "in only a small amount of economic damages" will support ratios exceeding single digits. *See id.* at 425. Here, although Saunders' economic damages were small, BB&T's egregious misconduct was apparently sufficient for the jury to assess an $80,000 punitive damages award.

A more relevant set of reprehensibility factors to consider in evaluating an allegedly excessive punitive damages award in a consumer credit context that is nevertheless consistent with State Farm and Gore, as well as the FCRA, are: (1) whether a plaintiff was financially vulnerable; (2) whether the conduct involved repeated actions or was an isolated incident; (3)

whether there were factors mitigating the reprehensibility of the defendant's conduct;[16] and (4) whether the punitive damages award was properly based on an award of compensatory, as opposed to statutory, damages.  This is not to say that a court may not also consider those remaining reprehensibility factors[17] outlined by the Supreme Court in both State Farm and Gore. Rather, the four specific factors as noted above are, in this Court's opinion, those which are more directly applicable and relevant to evaluating the alleged excessiveness of a punitive damages award in a FCRA case.  Such a conclusion is bolstered by the fact that the first and second reprehensibility factors delineated by the Supreme Court focus on a wrongdoer's indifference to, or reckless disregard of, the *physica*l health and safety of the purported victim.  *See* State Farm, 538 U.S. at 419.  Again, as emphasized earlier, these factors are virtually nonexistent in FCRA cases in which a victim's damages involve purely economic, as opposed to physical, damages. Moreover, the fifth factor likewise has limited applicability because, as noted previously, punitive damages in a FCRA case may be awarded even though intentional malice is nonexistent. Finally, the Supreme Court itself has acknowledged that the punitive damages "guideposts" are not the only guideposts a reviewing court may consider in performing its due process analysis, *see* Gore, 517 U.S. at 606 (Scalia, J., dissenting) ("The Court nowhere says that these three 'guideposts' are the only guideposts."), and other Circuit Courts of Appeals have noted that the

---

[16] Although BB&T offered to defer the accrued interest and late penalty fees until the end of the loan period, *supra* at 5, it did not take any further action to mitigate the problem it alone had created for Saunders.

[17] Whether (1) the harm caused was physical as opposed to economic; (2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; and (3) the harm was the result of intentional malice, trickery, or deceit, or mere accident.  *See* State Farm, 538 U.S. at 419 (citing Gore, 517 U.S. at 575, 576-77).

guideposts need not be rigidly or exclusively applied and should not be taken as an "analytical straight jacket." *See* In re Exxon Valdez, __ F.3d __; 2006 U.S. App. LEXIS 31503, at *37-38 (9th Cir. Dec. 22, 2006) (quoting Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 81 (1st Cir. 2001)).

Although, as in Bach, if not in all consumer protection scenarios, Saunders suffered "only" economic harm and not physical harm, he was rightfully considered to be a vulnerable victim as demonstrated, for example, by the dramatic decline in his credit rating as a result of BB&T's misconduct that was established by evidence offered at trial.  And even though there was no evidence of similar misconduct involving other consumers, BB&T's conduct was sufficiently egregious to justify the $80,000 punitive damages award where it failed to follow its own internal procedures for booking the loan, took a financially vulnerable consumer and willfully misrepresented responsibility for the loan after repeated attempts by that consumer to corroborate same, refused to accept Saunders' offers of payment on the loan, repossessed the collateral for the loan and sold it at an auction, and then reported to the CRAs that Saunders was not making his payments and was in default.  Throughout this time period, BB&T never once took steps to correct its behavior, *i.e.*, its attempts at mitigation were minimal, and Saunders testified that the entire experience left him ashamed, embarrassed, and humiliated.  After receiving evidence of BB&T's net worth of nearly $3.2 billion, there was clearly a sufficient basis for the jury to find that, although Saunders sustained only minimal statutory damages, BB&T's willful noncompliance with the FCRA justified a punitive damages award of $80,000.

## CONCLUSION

The FCRA is designed to protect consumers from inaccurate information in consumer

reports, *see* 15 U.S.C. § 1681(a)-(b), by establishing credit reporting procedures which utilize correct, relevant and up-to-date information in a confidential and responsible manner; accordingly, the Act must be liberally construed in support of that purpose.  Jones v. Federated Fin. Reserve Corp., 144 F.3d 961, 964 (6th Cir. 1998) (citation omitted).  The FCRA imposes distinct obligations on those entities which furnish information to consumer reporting agencies, *see* 15 U.S.C. § 1681s-2(a)-(b), and punitive damages may be awarded where such a furnisher commits a willful violation of the statutes provisions, *see* 15 U.S.C. § 1681n, even if a jury concludes that a consumer is entitled to only statutory, as opposed to compensatory, damages.

In the absence of a bright line rule by Congressional mandate or controlling judicial precedent, and out of respect for a precise award based on what does not appear to have been a figure simply "pulled out of the air,"[18] the Court is most persuaded by that precedent delineated in State Farm and Gore recognizing an exception for those cases with low compensatory relief, it being noted that the same precedent did not involve a consumer protection scenario so that considerations of such factors as whether there was physical harm as opposed to economic damage is of little value.  Any reduction by this Court of an award that was decided by a jury who were fully instructed regarding all relevant aspects would be purely arbitrary as further demonstrated by the fact that any reduction would, in all probability, result in a punitive award for the Plaintiff that would be surpassed, if it is not already, by the eventual award of attorney's fees and costs.  Even though the Supreme Court's concerns regarding the "imprecise manner" in which punitive damage awards are rendered must be noted, this Court concludes that it would, in

---

[18]The award would have been more "suspicious" in the sense of being completely arbitrary if it were "rounded off" to, say, $100,000.

effect, be depriving the Plaintiff of his due process rights in reducing an award by a properly-instructed jury which reached its decision based on sufficient evidence of misconduct and the economic ability (substantial net worth) of the offending Defendant to withstand such an award while forcing it to acknowledge the award's legitimate punitive and deterrent purpose.  Only when a punitive damages award can be fairly categorized as "grossly excessive" in relation to the purposes of punishment and deterrence will the award enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment.  Gore, 517 U.S. at 568 (citing TXO, 509 U.S. at 456).  The jury's $80,000 punitive damages award in this case enters no such zone of arbitrariness as it reasonably punishes BB&T for particularly egregious "conduct that harmed the plaintiff, not for being an unsavory individual or business."  State Farm, 538 U.S. at 423.

For these reasons, BB&T's motion must be DENIED.


An appropriate Order shall issue.


_____/s/_____
Dennis W. Dohnal
United States Magistrate Judge


Dated: 1/8/07